UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALEX KISLOV and NIKO HEARN, individually and on behalf of a class of similarly situated individuals,<br><br>    Plaintiffs,<br><br>  v.<br><br>AMERICAN AIRLINES, INC., a Delaware Corporation,<br><br>    Defendant. | No. 17 C 9080<br><br>Judge Rebecca R. Pallmeyer |

### MEMORANDUM OPINION AND ORDER

In this proposed class action, Plaintiffs Alex Kislov and Niko Hearn allege that Defendant American Airlines, Inc. ("American") violated various provisions of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), by using interactive voice response software in the airline's customer service hotline. After this case was removed to federal court in 2017, the parties engaged in protracted settlement negotiations and motion practice. Most recently, the court severed and remanded to state court one of the three BIPA claims asserted by Plaintiffs [106]. Now, American moves [95] to dismiss all remaining claims, arguing that they are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713 ("ADA"). For the following reasons, the court dismisses the complaint without prejudice.

### BACKGROUND

The court has already set forth the facts of this case in a published opinion, and summarizes only the relevant background information. *Kislov v. Am. Airlines, Inc.*, ___ F. Supp. 3d ___, 2021 WL 4711741, at *1–2 (N.D. Ill. Oct. 8, 2021). At this stage of the proceedings, the court accepts as true the allegations in the Third Amended Complaint (hereinafter "TAC" or "the Complaint"). Defendant American, which operates a fleet of aircrafts and makes thousands of flights per day, also "operates a 24-hour customer service hotline to assist its customers and

respond to customer questions, issues, and complaints." (TAC [93] ¶¶ 22–23.)  Around July 2011, "in an effort to better achieve customer service goals and reduce call agent volumes, Defendant integrated 'Interactive Voice Response' [ ] software into its customer support hotline."  (*Id.* ¶ 24.) Interactive voice response "is the robot voice that a caller hears when calling a customer support hotline."  (*Id.* ¶ 25.)  American's voice response software collects, analyzes, and stores callers' actual voiceprints to understand or predict the caller's request, automatically respond with a personalized response, and "trace" callers (that is, track interactions and determine whether a caller has previously interacted with American).  (*Id.* ¶¶ 25, 27, 31.)  American saves this data to a cloud-based server so that it can be provided to a customer service agent, if the call is transferred to another agent or the caller has additional interactions with American.  (¶¶ 25, 31.) The software "proactively uses information about callers and their trips to anticipate the reason for the call, personalize the experience, and shorten hold times."  (*Id.* ¶ 32.)

Plaintiffs Hearn and Kislov have both called American's customer service hotline.  Hearn alleges that on dates after December 2020, he called American's customer service hotline "multiple times . . . to resolve several issues pertaining to flights departing from Illinois." (*Id.* ¶ 35.) Kislov called the hotline in December 2019; the Complaint does not say why Kislov called, or whether he called more than once.  (*Id.* ¶ 34.)  During these calls, Plaintiffs allege, American obtained their voiceprints without written consent, "in order to analyze the intent and determine the context of Plaintiffs' calls, prepare information to be passed on to a customer service representative as needed, and to allow Defendant to review the phone call to determine whether there were any issues" with the software.  (*Id.* ¶¶ 37–39.)  American also disclosed this data to its software vendor, without Plaintiffs' consent, for cloud storage purposes.  (*Id.* ¶ 40.)

In the Third Amended Complaint, Plaintiffs asserted three claims under BIPA, an Illinois statute enacted in 2008 to protect individuals' privacy interests in their biometric information. *Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶¶ 19–20, 129 N.E.3d 1197, 1203 (2019). Section 15 of BIPA regulates how private entities collect, retain, disclose, and destroy biometric

information and identifiers, including "voiceprints." *Id.*; *see* 740 ILCS 14/15(a)–(e). This court previously severed and remanded Count I to state court, concluding that Plaintiffs lacked Article III standing to pursue, in federal court, their Section 15(a) claim (that American failed to make publicly available its biometric retention and destruction policy). *Kislov*, 2021 WL 4711741, at *5. The remaining claims before the court are Count II, which alleges that American collected or otherwise obtained biometric data without first obtaining informed written consent, in violation of Section 15(b); and Count III, which alleges that American disclosed biometric data without obtaining consent, in violation of Section 15(d). (SAC ¶¶ 63–67, 74–77.) American moves to dismiss these remaining BIPA claims [95] under Rule 12(b)(6), arguing that both claims are preempted by the Airline Deregulation Act.

## DISCUSSION

Preemption is an affirmative defense, on which the defendant bears the burden of proof. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). Typically, an affirmative defense should be brought in a Rule 12(c) motion for judgment on the pleadings, rather than a Rule 12(b)(6) motion to dismiss. *Id.* However, the Seventh Circuit recognizes a "narrow and pragmatic exception," where the plaintiff has pleaded herself out of court. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020); *see also Burton v. Ghosh*, 961 F.3d 960, 965 (7th Cir. 2020) (dismissal under Rule 12(b)(6) is appropriate "if the availability of a defense is apparent in the plaintiff's complaint itself").

American argues that it is apparent on the face of the complaint that the ADA preempts Plaintiffs' claims. Congress passed the ADA as part of its effort to deregulate the airline industry in the late 1970s, with the goal of "promot[ing] 'efficiency, innovation, and low prices' in the airline industry through 'maximum reliance on competitive market forces and on actual and potential competition.'" *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014) (quoting 49 U.S.C. §§ 40101(a)(6), (12)(A)). To that end, Congress included a preemption provision "[t]o ensure that the States would not undo federal deregulation with regulation of their own." *Morales v. Trans*

3

*World Airlines, Inc.*, 504 U.S. 374, 378 (1992). This provision stipulates that a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C.A. § 41713(b).

In a case involving the Federal Aviation Administration Authorization Act ("FAAAA"), which governs both air and motor carriers, and whose preemption provisions are interpreted under the same standards as the ADA, the Supreme Court explained that, at a minimum, preemption occurs where the state action has a "significant impact" related to Congress' preemption-related objectives—but there is no preemption where the state action's effect on rates, routes, or services is "tenuous, remote, or peripheral." *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 368, 370–71 (2008) (quoting *Morales*, 504 U.S. at 390). As the Seventh Circuit has articulated the test, "a claim is preempted if *either* the state rule expressly refers to air carriers' rates, routes, or services, or application of the state's rule would have 'a significant economic effect upon them.'" *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 609 (7th Cir. 2000) (quoting *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996)).

American argues that Plaintiffs' BIPA claims concerning the use of interactive voice response software in its customer service hotline relate to the services American provides its customers. (Def.'s Mem. at [96] at 4–8.) In response, Plaintiffs argue that their claims do not concern any "service" covered by the ADA, and, even they did, American has not established a "significant economic impact" warranting dismissal on the pleadings. (Pls.' Mem. [108] at 5.)

**I.      Airline Services**

The threshold issue is whether Plaintiffs' BIPA claims implicate an activity covered by the ADA's preemption provision—specifically, airline "services." The Seventh Circuit has adopted a broad definition of "services," concluding that it refers to "a bargained-for or anticipated provision of labor from one party to another." *Travel All Over the World*, 73 F.3d at 1433 (quoting *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 336 (5th Cir.1995)). This bargain is not restricted to the airline's provision of transportation; rather, "the air carrier service bargain include[s] items such

4

as ticketing, boarding procedures, provision of food and drink, and baggage handling." *Id.* (quoting *Hodges,* 44 F.3d at 336). Other courts have clarified that this definition is limited to "bargained-for aspects of airline operations over which carriers compete." *Branche v. AirTran Airways, Inc.*, 342 F.3d 1248, 1258 (11th Cir. 2003) (emphasis removed).

The question here is whether the customer service hotline is part of the "bargained-for" exchange between American and its customers. The court concludes that it is. Customers anticipate that, when they purchase an airline ticket, carriers will provide customer assistance, just as customers expect "baggage handling" or "food and drink." *See Travel All Over the World*, 73 F.3d at 1433. And, like these other aspects of airline travel, airlines "compete" over customer service. Customer assistance—either before or after the flight—is an "integral part of the customer's experience of air travel," which customers consider "in evaluating the quality" of that experience. *See Branche*, 342 F.3d at 1258 (holding that airlines compete over boarding procedures). Indeed, the Complaint itself alleges that American implemented the voice recognition software "to better achieve customer service goals" through personalization and reduced hold times—and, presumably, to attract customers and gain a competitive advantage over other airlines. (TAC ¶¶ 24, 32.)

Plaintiffs do not contest that customer service is a "service" under the ADA. Instead, they urge that their BIPA claims concern only American's decision to implement voice recognition software and collect biometric data, rather than customer service more generally. But Plaintiffs cannot characterize their privacy claims as relating only to American's unlawful handling of their personal data, where that data was collected in the course of (and in furtherance of) American's provision of services. Rather, numerous federal courts have held privacy-related claims preempted in similar circumstances. *See Pena v. Brit. Airways, PLC (UK)*, No. 18 CV 6278 (LDH) (RML), 2020 WL 3989055, at *1, 5 (E.D.N.Y. Mar. 30, 2020), *aff'd*, 849 F. App'x 13 (2d Cir. 2021) (claims under New York consumer protection law against an airline for failing to safeguard data, in violation of its privacy policy; airline collected data when customers purchased tickets and made

reservations on its online platform and mobile application); *Pica v. Delta Air Lines, Inc.*, No. CV 18-2876-MWF (Ex), 2019 WL 1598761, at *1, 4–5 (C.D. Cal. Feb. 14, 2019), *aff'd,* 812 F. App'x 591 (9th Cir. 2020) (contract claim for airline's mishandling of passenger data, collected when providing online "travel reservation, air transportation, and related services"); *McGarry v. Delta Air Lines, Inc.*, No. CV 18-9827-MWF (Ex), 2019 WL 2558199, at *1–2, 5–6 (C.D. Cal. June 18, 2019), *aff'd,* 812 F. App'x 625 (9th Cir. 2020) (contract claim for airline's failure to safeguard data collected when passengers made online reservations); *Copeland v. Nw. Airlines Corp.*, No. 04-2156 M1/V, 2005 WL 2365255, at *1, 3 (W.D. Tenn. Feb. 28, 2005) (claim under Tennessee consumer protection law for disclosing passenger data from its "Airline Passenger and Reservation database," including names, credit card numbers, and information about their itineraries); *In re JetBlue Airways Corp. Priv. Litig.*, 379 F. Supp. 2d 299, 304, 315–16 (E.D.N.Y. 2005) (claim under consumer protection statutes for obtaining data in violation of the airline's privacy policy; data obtained online and over the telephone "during the selection and purchase of travel arrangements"); *In re Am. Airlines, Inc., Priv. Litig.*, 370 F. Supp. 2d 552, 556, 563–64 (N.D. Tex. 2005) (Texas claims regarding the airline's collection of data when taking reservations or selling tickets online and over the telephone); *In re Nw. Airlines Priv. Litig.*, No. CIV.04-126(PAM/JSM), 2004 WL 1278459, at *1, 4 (D. Minn. June 6, 2004) (claim under Minnesota consumer protection law against the airline for disclosing its "passenger name records," in violation of its privacy policy; records included names, flight numbers, and hotel reservations).

Plaintiffs here could argue that these cases can be distinguished on the basis that they involve situations in which the defendant-airline collected data when taking reservations or selling tickets (rather than providing customer service)—but such an argument would not be persuasive. The Complaint itself confirms that the customer service hotline is used to facilitate air transportation: Plaintiffs allege that the hotline is used "to assist [American's] customers and respond to customer questions, issues, and complaints," that the software collects and uses "information about callers and their trips," and that Plaintiff Hearn called the hotline "multiple times

. . . to resolve several issues pertaining to flights departing from Illinois." (*Id.* ¶¶ 23, 31, 35.) The only plausible reading of the Complaint is that the hotline offers customers access to and assistance regarding their "trips" and "flights." *Cf. Northwest*, 572 U.S. at 284 (finding an airline's frequent flier program is "connected to 'services,' *i.e.,* access to flights and to higher service categories"); *accord Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 226 (1995). Moreover, the Seventh Circuit's definition of "services" is not limited to the provision of air transportation. As this court has explained, American's hotline is itself a "service" under the ADA, because it is an integral and bargained-for part of the customer's airline experience. Plaintiffs' BIPA claims are directed at these communications between American and its customers, and therefore implicate "services".[1] *See Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 360, 366 (S.D.N.Y. 2008), *aff'd,* 337 F. App'x 7 (2d Cir. 2009) (tort claim about plaintiff's post-flight telephone complaints to the airline and the airline's responding customer service "clearly relate[ ] to an airline service").

---

[1] The majority of circuits have agreed with the Seventh Circuit's broad definition of "services," adopted from the Fifth Circuit's decision in *Hodges,* 44 F.3d at 336. *Bower v. Egyptair Airlines Co.,* 731 F.3d 85, 94 (1st Cir. 2013); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008); *Koutsouradis v. Delta Air Lines, Inc.,* 427 F.3d 1339, 1343 (11th Cir. 2005); *see Arapahoe Cnty. Pub. Airport Auth. v. F.A.A.,* 242 F.3d 1213, 1222 (10th Cir. 2001) (citing the *Hodges* definition); *Smith v. Comair, Inc.,* 134 F.3d 254, 259 (4th Cir.1998) (same); *see also Watson v. Air Methods Corp.*, 870 F.3d 812, 818 (8th Cir. 2017) (assuming the *Hodges* definition is correct).

The Third and Ninth Circuits have adopted a narrower definition, holding that "services" must be directed to the provision of air transportation itself, not attendant amenities. *See Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 726–28 (9th Cir. 2016); *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.,* 164 F.3d 186, 194 (3d Cir. 1998). Based on this narrower definition, the Ninth Circuit concluded that the ADA did not preempt a state antidiscrimination claim relating to ticketing kiosks, which allowed passengers to check-in, print boarding passes, and perform similar travel-related tasks. *Nat'l Fed'n of the Blind*, 813 F.3d at 723, 726–27. And, relying on this precedent, a California district court concluded that an airline's customer service line allowing passengers to purchase tickets was not a service, meaning the ADA did not preempt plaintiff's claim about the airline's undisclosed recording of calls. *Kindt v. Concesionaria Vuela Compania de Aviacion S.A.P.I. de C.V.*, No. 17-CV-04333-JD, 2018 WL 4468320, at *1–2 (N.D. Cal. Sept. 18, 2018). But other courts in the Ninth Circuit have held preempted claims concerning an airline's handling of customer data collected when plaintiffs made reservations or purchased tickets. *See Pica*, 2019 WL 1598761, at *1, 4–5; *McGarry*, 2019 WL 2558199, at *1–2, 5–7. This court has not found (and the parties have not provided) any other case holding that a customer service hotline is not a service under the ADA.

Plaintiffs' remaining arguments are unconvincing as well. Plaintiffs again try to isolate the voice recognition software from the context of their BIPA claims, and contend no airline customer could have (or would have) bargained for this software, an undisclosed component of American's services.[2] (Pls.' Mem. at 6.) This misunderstands the inquiry under the ADA. The relevant question "is whether enforcement of the plaintiff's claims would impose some obligation on an airline-defendant with respect to conduct that, when properly undertaken, is a service." *Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 454 (1st Cir. 2014). Thus, in *Tobin*, the First Circuit held that plaintiff's tort claims (which alleged the misdelivery of someone else's package to her) implicated "services," and rejected plaintiff's argument that "no one would bargain for [tortious conduct]," because enforcement of her claims would still impact the carrier's package handling and delivery—that is, a service. *Id.* at 452–54. Similarly, in *Travel All Over the World*, 73 F.3d at 1434, the Seventh Circuit rejected plaintiff's argument that conduct performed with ill intent cannot constitute a "service," and held preempted intentional tort claims based on an airline's canceling of tickets; the airline personnel's subjective motivations were "irrelevant," because the crucial inquiry is whether "the claims at issue . . . would have a significant economic effect on the airline's services."

While customers may not bargain for the collection of their biometrics through voice recognition software, they do bargain for customer assistance—and enforcement of Plaintiffs' BIPA claims would impact American's provision of that service. Plaintiffs themselves have alleged that American integrated this software into the hotline to improve customer service, meaning any BIPA requirement regarding the software necessarily involves wholesale changes to American's

---

[2] In support of this argument, Plaintiffs cite only *Donoff v. Delta Air Lines, Inc.*, No. 18-81258-CV, 2019 WL 9091763 (S.D. Fla. July 9, 2019), which held that Delta's marketing of third-party travel insurance was not a "bargained-for" aspect of its operations. The court rested its decision on the third-party nature of the insurance, noting that Delta is not a party to the insurance policy, is not mentioned in the email containing the purchased policy, and only requires customers purchasing an online ticket to select or reject trip insurance. *Id.* at *4. Since the proper inquiry is whether American's provision of its own customer service hotline is a "service," this case is easily distinguishable.

8

customer service practices. Given this, the relevant activity for preemption purposes is American's provision of a customer service hotline, not its allegedly unlawful use of voice recognition software. *Cf. Pena*, 2020 WL 3989055, at *4 (rejecting argument that data breach claim related solely to the airline's unlawful privacy policy, rather than its services); *JetBlue Airways*, 379 F. Supp. 2d at 316 (the relevant activity was the provision of reservations and tickets, not the unlawful third-party disclosure).

For similar reasons, the court finds unpersuasive Plaintiffs' contention that people may call the hotline for non-customer service reasons. Plaintiffs suggest an individual could "accidentally misdial[ ]" the number, and note there is no allegation that Plaintiff Kislov called the hotline "regarding a customer service request." (Pls.' Mem. at 6–7.) But "ADA preemption does not require that the plaintiff be the customer for whom a service is undertaken." *Tobin*, 775 F.3d at 454 (rejecting plaintiff's argument that tort claims arising out of her receipt of a mislabeled and misdelivered package did not implicate "services" because she was not part of the delivery transaction and thus "did not [herself] bargain for the delivery of an unwanted package"). If any plaintiff—regardless of their motivation for calling the hotline and even if they are not an American customer—succeeds on this specific BIPA claim, American will need to alter its provision of its customer service. In any event, this misdialing speculation is just that—speculation. Plaintiffs do not offer a non-customer-service reason for Kislov to call the hotline, nor do they identify any putative class member who fits this fact pattern. Plaintiffs' claims, as alleged in the Complaint, implicate American's services.

## II. "Relates To"

Next, the court considers the "relating to" inquiry. Although BIPA is not directed towards airlines, Plaintiffs' claims may nonetheless "relate to" airline rates, routes, or services if they have a "significant economic effect upon" those matters. *Mesa Airlines*, 219 F.3d at 609. This is not a "simple all-or-nothing" inquiry; rather, courts must determine on which side of "the preemption line" a claim falls. *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am.*, 697 F.3d 544, 550 (7th Cir.

9

2012). Given this difficult line-drawing endeavor, the court considers where other state-law claims have landed on this preemption spectrum, before turning to Plaintiffs' claims.

The Supreme Court has considered ADA preemption in a trio of cases. First, in *Morales*, the Court held that the ADA preempted the use of state consumer protection laws to enforce airline advertising guidelines, which mandated "how tickets may be marketed if they are to be sold at given prices." *Morales*, 504 U.S. at 388. Then, in *Wolens*, the Court confirmed that generally applicable consumer protection laws may be preempted: *Wolens* held that the ADA preempted claims under the Illinois Consumer Fraud Act regarding the airline's retroactive changes to the terms and conditions of its frequent flier program. *Wolens*, 513 U.S. at 225. The *Wolens* Court explained that consumer fraud claims are aimed at efforts to "guide and police the marketing practices of the airlines," rather than "simply giv[ing] effect to bargains offered by the airlines and accepted by airline customers." *Id.* at 228. Breach-of-contract claims asserted by the *Wolens* plaintiffs were not preempted, because airline terms and conditions are "privately ordered obligations," and "[m]arket efficiency requires effective means to enforce private agreements." *Id.* at 229–30. Finally, extending the rationale of *Wolens,* the *Northwest* Court concluded that the ADA preempts state common-law claims that seek "to enlarge the contractual obligations that the parties voluntarily adopt." *Northwest*, 572 U.S. at 276. To exempt common-law claims from the ADA's preemptive scope, the Court held, would "disserve the central purpose of the ADA"—that is, allowing rates, routes, and services "to be set by market forces." *Id.* at 283.

In *Rowe,* likewise, the Court concluded that the similarly-interpreted FAAAA barred enforcement of a state law that interfered with market efficiency. At issue in that case were regulations relating to the shipment of tobacco into the state of Maine; the regulations required retailers to use a delivery system that included verification procedures and effectively required carriers to inspect each package to avoid civil liability. *Rowe*, 522 U.S. at 368–69, 373. The Court acknowledged that laws broadly prohibiting "certain forms of conduct," which affect carriers "only in their capacity as members of the public," are not preempted. *Id.* at 375. But the challenged

10

provisions in *Rowe* were preempted, the Supreme Court concluded, because they "require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)," thus impermissibly substituting the state's "own governmental commands for 'competitive market forces.'" *Id.* at 372–73 (quoting *Morales*, 504 U.S. at 378).

Taken together, these cases distinguish between state-law claims that enforce or provide a backdrop for voluntary agreements, and those that impermissibly expand obligations (and interfere with the market) based on state policy. The Seventh Circuit elaborated on this distinction in *S.C. Johnson*, 697 F.3d 544. There, plaintiffs brought various state-law claims alleging that transportation carriers engaged in a kickback scheme. *Id.* at 545. The court permitted claims under state bribery and racketeering laws to proceed, reasoning that those laws just "set basic rules for a civil society, rather than particular terms of trade between parties to a transaction." *Id.* at 558. But plaintiffs' fraud and fraudulent misrepresentation claims were preempted, because they sought "to substitute a state policy (embodied in law) for the agreements that the parties had reached." *Id.* at 557. The court rejected "strong arguments questioning why a free market would ever need to tolerate deceptive, fraudulent, or other offensive agreements," noting that "one state's deceptive practice might be another state's hard bargain." *Id.* The ADA and FAAAA therefore prevent states from "displac[ing] the market" through "well-meaning but widely varying paternalistic provisions designed to protect consumers from the rigors of the market." *Id.*

The BIPA provisions Plaintiffs seek to enforce here appear to fall on the "paternalistic" consumer-protection side of the line. If successful, Plaintiffs' claims would expand American's contractual obligations to its customers by requiring American to receive consent from Illinois callers before disclosing data to its vendors, and to provide written notice and receive a written consent waiver from any Illinois caller before providing customer service through the telephone hotline. Determining whether any individual interaction occurred substantially in Illinois (or whether the caller could so claim) could prove so burdensome as to completely undermine the value of American's voice response software altogether. *See* 740 ILCS 14/15(b), (d). In short,

allowing a BIPA challenge to this customer service would require the airline to provide privacy protections that it does not wish to offer. And American's expanded obligations would not be limited to BIPA. Absent a finding of preemption, American could potentially be subject to a "patchwork" of varying state privacy laws, a result "inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Rowe*, 552 U.S. at 373. In the current marketplace, airlines and customers are free to contract for stronger or weaker privacy protections, and customers are free to choose among airlines based on the airlines' varying privacy policies. Illinois may not displace this market by imposing its restrictive BIPA requirements on voluntary agreements between airlines and their customers.

Numerous federal courts have held other state privacy claims preempted. *See supra*. Because Plaintiffs' BIPA claims seek to regulate how American interacts and communicates with its customers by adding additional privacy obligations, this court concludes that such claims, too, are preempted by the ADA.

Plaintiffs' central argument in opposition is that American has not established a "significant economic impact," and resolution on the pleadings is therefore inappropriate. The court first notes that Plaintiffs' contention—that their BIPA claims will impose only minimal costs on American's customer service hotline—is implausible. Enforcement of BIPA in this context would require American (which makes thousands of flights per day) to provide written notice and receive written consent for each new Illinois customer who calls the customer service hotline. Plaintiffs' comparison to BIPA compliance costs in the employment context is inapt, as an employer or provider of biometric technology only needs to receive a written waiver once, from a known individual, at the start of employment. (Pls.' Mem. at 8 (citing *King v. PeopleNet Corp.*, No. 21 CV 2774, 2021 WL 5006692, at *9 (N.D. Ill. Oct. 28, 2021).)

Plaintiffs nonetheless urge that there is an "unresolved factual issue," because American has failed to explain "the degree to which BIPA's requirements would impose economic costs" on American. (Pls.' Mem. at 8–9.) Plaintiffs distinguish the numerous federal court decisions holding

state privacy claims preempted by contending that our Court of Appeals (unlike other jurisdictions) requires defendants to show a "significant economic effect." (*Id.* at 8 (citing *Travel All Over the World*, 73 F.3d at 1432).) But contrary to Plaintiffs' suggestion, the Seventh Circuit has not imposed a special preemption test requiring evidence of increased costs even where—as here—it is clear that the challenged state action has "a 'significant impact' related to Congress' deregulatory and pre-emption-related objectives." *Rowe*, 552 U.S. at 371 (quoting *Morales*, 504 U.S. at 390). Indeed, in *Rowe*, the Court concluded that the state regulation was preempted, even though it allegedly "impose[d] no significant additional costs upon carriers," because it was still "inconsistent" with the ADA's preemption objections. *Id.* at 373; *see also Bower v. EgyptAir Airlines Co.*, 731 F.3d 85, 96 (1st Cir. 2013) (explaining that, under *Rowe*, the ADA preempts state laws with "a significant regulatory effect" on airline operations, whether at high or low cost to the airline); *accord Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 405 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 5 (2d Cir. 2016).

The preemption inquiry considers the nexus between the challenged state action and its impact on airline operations, and then asks how direct that nexus is. Only when the nexus is attenuated is evidence of economic effect necessary to establish the required "significant impact." That is because all laws tangentially affect the cost of rates, routes, or services by regulating "inputs" (for example, employment laws regulate airline employees, or labor inputs)—but without evidence that this has a significant economic effect on the eventual "output" (the agreement between the airline and its customers), there can be no preemption. *See S.C. Johnson*, 697 F.3d at 558; *see also Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1054 (7th Cir. 2016) ("Laws that merely govern a carrier's relationship with its workforce [ ] are often too tenuously connected to the carrier's relationship *with its consumers* to warrant preemption," but "[l]aws that affect the way a carrier interacts with its customers" are "squarely" preempted.).

Where, in contrast, as in this case, the state-law claims directly impact American's interactions with its customers, and directly regulate the airline's provision of services, that state

13

law inherently interferes with the ADA's purpose.  For that reason, the court is not persuaded by Plaintiffs' reliance on cases from this district considering BIPA claims regulating a carrier's relationship with its employees or contractors.  These courts held, on the pleadings, that airline employees' BIPA claims about their employer-airline's attendance tracking system were not preempted, because the airline had only shown—at most—a tenuous connection between enforcement of the claims and "passenger safety" or "baggage handling" (the asserted airline services).  See *Abudayyeh v. Envoy Air, Inc.*, No. 20-CV-00142, 2021 WL 3367173, at *11 (N.D. Ill. Aug. 3, 2021); *Nseumen v. DAL Glob. Servs., Inc.*, No. 21 C 2630, 2021 WL 4728707, at *2 (N.D. Ill. Oct. 11, 2021); see also *Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2019 WL 5635180, at *1, 3 (N.D. Ill. Oct. 31, 2019) (on a motion to dismiss; where a truck driver scanned into an identity verification system when dropping off freight at BNSF's railyard, BIPA's impact on rates, routes, or services was "highly speculative"); *Roger v. BNSF Ry. Co.*, No. 19 C 3083, 2022 WL 787955, at *6 (N.D. Ill. Mar. 15, 2022) (on summary judgment; BNSF provided no evidence for its argument that compliance with BIPA—by manual verification of driver identity, or by altering its existing system—would impact the efficiency of its facilities' operations).  That is not the case here.

In a similar vein, the court rejects Plaintiffs' argument that preemption cannot be determined on the pleadings.[3]  Where the defendant's preemption argument rests on an attenuated economic connection, resolution on summary judgment, with a more developed factual record, may be appropriate.  But where the preemption theory is based on the state's direct regulation of airline operations, courts regularly dismiss on the pleadings.  See, e.g., *Northwest*, 572 U.S. at 289 (motion to dismiss); *Wolens*, 513 U.S. at 235 (motion to dismiss); *S.C. Johnson*,

---

[3]  Arguing that the court must defer adjudication of this issue until summary judgment, Plaintiffs cite only *Zamber v. Am. Airlines, Inc.*, 282 F. Supp. 3d 1289, 1302 (S.D. Fla. 2017), a case involving third-party travel insurance purchased through the airline's website; the plaintiff's claims in that case did not directly implicate the airline's own services.  The *Zamber* court characterized the travel insurance claim as presenting an issue of first impression "throughout the entire court system," and therefore more appropriately considered on summary judgment.

14

697 F.3d at 547 (motion to dismiss); *Mesa Airlines*, 219 F.3d at 607 (judgment on the pleadings). Such a disposition is warranted here.

## **CONCLUSION**

For the foregoing reasons, Defendant American's motion to dismiss [95] is granted. The complaint is dismissed. As this ruling is the first time the court has considered a pleadings challenge against these Plaintiffs' BIPA claims, the dismissal is with leave to amend.[4] Plaintiffs' amended complaint, if any, shall be filed within 28 days.

ENTER:

Dated: March 22, 2022

REBECCA R. PALLMEYER
United States District Judge

---

[4] This case originated as a challenge to American's use of a biometric system to track the work time of its employees. See Notice of Removal and Complaint [1-1]. The Third Amended Complaint was filed by a new set of plaintiffs and raises an entirely new legal theory. *See Kislov*, 2021 WL 4711741, at *1. American argues that the court must treat the TAC (if not dismissed) as an entirely new lawsuit for statute of limitations purposes. (Def.'s Mem at 8 n.2.) American made no mention of this concern when the TAC was filed, has not now made any substantive argument that the case is time-barred, and has not otherwise briefed this issue. If Plaintiffs file an amended complaint, American may raise this argument then.

15